# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### MIDLAND/ODESSA DIVISION

**FILED**

JUL - 2 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| ex rel., MICHAEL HILDEBRAND, M.D. | § |
| | § |
| **Relators,** | § |
| | § |
| vs. | § |
| | § |
| ALLIANCE MEDICAL GROUP, | § |
| ALLIANCE HOSPITAL, LTD., | § |
| SUDHIR SRIVASTAVA, M.D., | § |
| JANGAYYA CHALLAPALLI, M.D., | § |
| WILLIAM G. REILLY, M.D., | § |
| M C PAREKH, M.D., | § |
| VINCENT RASCON, D.P.M., and | § |
| MICHAEL LOGAN RAMSEY, M.D., | § |
| | § |
| **Defendants.** | § |

CAUSE NO. **MO-04-CV-095**

## COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the UNITED STATES OF AMERICA, ex. rel., MICHAEL

HILDEBRAND, M.D., by and through his attorney, Gerald K. Fugit, and complaining of

ALLIANCE MEDICAL GROUP, ALLIANCE HOSPITAL, LTD.,  SUDHIR SRIVASTAVA,

M.D., JANGAYYA CHALLAPALLI, M.D., WILLIAM G. REILLY, M.D., M C PAREKH,

M.D., VINCENT RASCON, D.P.M., and MICHAEL LOGAN RAMSEY, M.D. and would

respectfully state to the Court as follows:

### PARTIES

1.      The UNITED STATES OF AMERICA, Claimant, is a party to this lawsuit by

virtue of 31 U.S.C.A., §3729 and §3730(b)(2), *et. seq.*, as amended.

COMPLAINT                                                                                    Page 1



2.     MICHAEL HILDEBRAND, M.D., Relator, will hereinafter also be referred to as Claimant.

3.     ALLIANCE MEDICAL GROUP is a Texas non-profit corporation entitled to do business in the State of Texas.  Service of process may be had upon this Defendant by serving its registered agent; namely, Daniel J. Hollman, 5030 East University, Suite D-103, Odessa, Texas 79762.

4.     ALLIANCE HOSPITAL, LTD. is a Texas limited partnership entitled to do business in the State of Texas.  Service of process may be had upon this Defendant by serving its registered agent; namely, Daniel J. Hollman, 5030 East University, Suite D-103, Odessa, Texas 79762.

5.     SUDHIR SRIVASTAVA, M.D. is a licensed medical doctor and practices medicine in Odessa, Ector County, Texas.  Service of process may be had upon this Defendant at his primary practice site, 419 West 4th Street, Suite 1000, Odessa, Texas 79761.

6.     JANGAYYA CHALLAPALLI, M.D. is a licensed medical doctor and practices medicine in Odessa, Ector County, Texas.  Service of process may be had upon this Defendant at his primary practice site, 500 Adams, Suite 400, Odessa, Texas 79761.

7.     WILLIAM G. REILLY, M.D. is a licensed medical doctor and practices medicine in Odessa, Ector County, Texas.  Service of process may be had upon this Defendant at his primary practice site, 519 North Lincoln, Odessa, Texas 79761.

8.     M C PAREKH, M.D. is a licensed medical doctor and practices medicine in Odessa, Ector County, Texas.  Service of process may be had upon this Defendant at his primary practice site, 601 North Golder, Suite A, Odessa, Texas 79761.

COMPLAINT                                                                                          Page 2

9.     VINCENT RASCON, D.P.M., is a licensed podiatrist and practices medicine in Odessa, Ector County, Texas and Midland, Midland County, Texas.  Service of process may be had upon this Defendant at his primary practice site, 3001 West Illinois Avenue, Midland, Texas 79701.

10.     MICHAEL LOGAN RAMSEY, M.D. is a licensed medical doctor and practices medicine in Odessa, Ector County, Texas.  Service of process may be had upon this Defendant at his primary practice site, 221 North Lincoln, Odessa, Texas 79761.

## JURISDICTION/VENUE

11.     Under the provision of 31 U.S.C.A., §3729 and §3730(b)(2), *et. seq.*, as amended, this cause of actions(s) is permitted under the provisions of the statute previously mentioned.  At all times, the Defendants named herein conducted business in Odessa, Ector County, Texas, Midland/Odessa Division of the Western District of Texas.

12.     Claimant/Relator is seeking an amount in excess of five million dollars ($5,000,000.00) in damages.  There cannot be a calculation of the damages with accuracy until such time as discovery has commenced and evidence has been presented to this Court/Jury.

## SPECIAL INSTRUCTIONS

13.     This Complaint is to be held in-camera by the Court for no less than sixty (60) days.

14.     This action is commonly called a qui-tam action.  However, there will be other claims that will be asserted.

COMPLAINT                                                                                           Page 3

15.    It is hereby requested the Attorney General of the United States of America, John Ashcroft, be served with citation at 666 11th Street NW, Washington, D.C., 20530-0002 by certified mail, return receipt requested.

16.    It is hereby requested the United States Attorney for the Western District of Texas be served with citation at 601 NW Loop 410, Suite 600, San Antonio, Texas 78216-5597 by certified mail, return receipt requested.

17.    It is requested this Court immediately set a Discovery Schedule per Rule 26, F.R.C.P., as amended, which became effective on December 1, 2000.

18.    All claims/causes of action are brought by the Claimant and Claimant's attorney with intention to assert such with good reason and cause.  In the event such claims/causes of action are in conflict with the present law of the State of Texas and/or the United States of America, then these claims/causes of action are not brought to harass and/or in a frivolous manner.  The claims/causes of action and other legal contentions herein are warranted by existing law and/or by non-frivolous argument for the extension, modification and/or reversal of the existing law and/or the establishment of new law.

## EXPERIMENTAL PERMISSION

19.    There is being used in the facility of ALLIANCE HOSPITAL, LTD., an experimental device known as the da Vinci Surgical System for heart surgery.  Such has been advertised on public television and via inter-net and has been used extensively.  The surgery involved, by use of the da Vinci Surgical System, has been approved by the Food and Drug

Administration only for a single vessel coronary bypass.  The surgery, by use of the da Vinci

Surgical System, has not been approved by the Food and Drug Administration for procedures

involving multiple vessel bypasses and/or A.V. node ablation.   Medicare and/or Medicaid

approves procedures and/or treatments only approved by the Food and Drug Administration.

Procedures involving multiple vessel bypass and/or a.v. node ablation by use of the da Vinci

Surgical System would significantly increase the risk and duration of surgery.

20.     On the following dates, SUDHIR SRIVASTAVA, M.D., has utilized the da Vinci

Surgical System for two (2) or more blood vessels, to wit:

| DATE | PROCEDURE |
| --- | --- |
| October 17, 2003 | thoracab two (2) vessel bypass |
| October 20, 2003 | thoracab two (2) vessel bypass |
| October 21, 2003 | thoracab two (2) vessel bypass |
| October 22, 2003 | thoracab two (2) vessel bypass |
| November 3, 2003 | thoracab two (2) vessel bypass |
| November 3, 2003 | thoracab three (3) vessel bypass |
| November 12, 2003 | a.v. sequential pacemaker and modified Maze procedure |
| November 20, 2003 | thoracab two (2) vessel bypass |
| December 5, 2003 | thoracab two (2) vessel bypass |
| December 12, 2003 | thoracab three (3) vessel bypass |

21.     Upon order of this Court, the names of the patients for the herein and above

described dates and procedures will be provided to the Court.  The number of minutes of the

duration of the procedures may also be provided to this Court. In compliance with HIPPA, such

have not been disclosed within this Complaint.

22.     The following paragraph is provided as an example of a coronary artery bypass graft performed by SUDHIR SRIVASTAVA, M.D.

23.     On April 5, 2004, a pre-operation chest x-ray revealed a soft-tissue mass in the right lung with recommendation from the Radiologist for further investigation. This is considered to be an ominous sign. In addition, there was a calcified well-defined shadow (coin lesion) in the left lung. This sign is consistent with a well healed fungus infection and is considered no cause for alarm. However, the patient underwent surgery two (2) hours after admission. Subsequent to the surgery, the patient remained weak and was unable to be discharged as usual. On the fifth day of hospitalization, the patient developed a small bowel obstruction. A bowel obstruction is a condition in which one (1) section of the intestine is constricted and fails to pass feces. This is an unusual occurrence after an operation on the chest, and more especially, the use of a minimal invasive procedure as was performed on this particular patient.

24.     On April 10, 2004, the patient was returned to the Operating Room for a resection of the small bowel obstruction. This was performed by a different surgeon on an emergency basis. The surgeon discovered that cancer has spread from the lung and had seeded itself across the abdomen of the patient. The portion of the cancer that was blocking the small bowel was repaired; however, the remainder of the cancer had spread rapidly and was unable to be removed from the patient.

25.     On April 19, 2004, the previously requested work-up for the right lung mass was pursued in order to find a source for the cancer. A computed tomography scan showed a solid

mass consistent with an aggressive tumor.  A prudent surgeon would have reconsidered the need for elective surgery with this information.

26.      On April 20, 2004, the patient was returned to the operating room for a repeat emergency release of a small bowel obstruction.  Despite the previous small bowel surgery, the bowel had failed to recover.

27.      On April 27, 2004, the patient described herein and above died in ALLIANCE HOSPITAL, LTD.  After death of the patient, while signing orders within the medical records, MICHAEL HILDEBRAND, M.D. discovered that the office notes from the referring Cardiologist had been added to the patient chart; however, such office notes were not available pre-operative.  Further, the office notes referred to the existence of the left sided coin lesion as being present for many years and no right lung lesion.  Penciled into the previous office notes was the term "right" and a question mark.  Therefore, MICHAEL HILDEBRAND, M.D. reviewed the surgeon's pre-operative report and discovered a penciled-in amendment in the same hand writing.  The office notes indicated that the right side coin lesion had been present in the referral notes and was considered safe.  However, neither of these penciled-in entries were present prior to the operation of the patient and/or at the time of death of the patient.  There is/ was no identification of who amended the medical records; however, documentation standards of the healthcare industry would indicate the name and title of the individual amending the records as well as the date and time of such entry/amendment.

28.      The usual approach used by SUDHIR SRIVASTAVA, M.D. for this type of cardiac surgery is a thoracic endoscopy with the da Vinci Surgical System.  The operation by use of the da Vinci Surgical System should result in minimal scar tissue and usually allows a

discharge of the patient after three (3) to four (4) days of surgery.  The operation requires a collapse of the right lung for most of the operation.  During prolonged anaesthesia, the body's ability to suppress the growth of cancer is terminated.

29.     As of the filing of this Complaint, the Food and Drug and Administration has not approved the da Vinci Surgical System for coronary artery bypass surgery.  However, the Food and Drug Administration has approved the da Vinci Surgical System for clinical trial for single artery coronary bypass surgery in which SUDHIR SRIVASTA, M.D. is a participant.

30.     As stated herein and above, several arteries were repaired by SUDHIR SRIVASTAVA, M.D. by utilizing the da Vinci Surgical System.

31.     If Medicare and/or Medicaid is billed for a procedure performed by utilization of a device under clinical trial by the Food and Drug Administration, such as the da Vinci Surgical System, fraud has been committed.

32.     It is estimated by MICHAEL HILDEBRAND, M.D. that SUDHIR SRIVASTAVA, M.D. utilizes the da Vinci Surgical System for more than one (1) vessel bypass in excess of seventy-five percent (75%) of his cases requiring a vessel bypass.

## UP CODING

33.     The Contract(s) for ALLIANCE HOSPITAL, LTD. were written to bypass certain procedures and a violation of 42 C.F.R., §485.52, was committed by ALLIANCE HOSPITAL, LTD. regarding supervision of non-physician providers and payment for those services performed within the hospital.   This violation of 42 C.F.R., §485.52, by ALLIANCE HOSPITAL, LTD. was committed with actual knowledge by the Board of Directors of

ALLIANCE HOSPITAL, LTD. and against the advice of an anesthesiology staff of ALLIANCE

HOSPITAL, LTD.

34.     There is attached hereto as Exhibit "A", and made a part hereof for all purposes,

one (1) copy of an "Employment Agreement" with Defendant, ALLIANCE HOSPITAL, LTD.

For the protection and privacy of the employee of ALLIANCE HOSPITAL, LTD., the

employee's name, signature and address have been eradicated by the office of the undersigned

attorney.

35.     The following procedures were performed by a Certified Registered Nurse

Anesthetist.  On information and belief, such were upcoded to reflect a single service by a

physician.  Each patient who received the procedure(s) described hereinafter was a  recipient of

Medicare.   The dates, names of physicians and procedures are included; however, in compliance

with HIPPA, the names and identification numbers of the patients will not be disclosed herein.

By order of this Court, MICHAEL HILDEBRAND, M.D. will produce the names and

identification numbers of such patients who received services described as follows:

| DATE | PHYSICIAN | PROCEDURE |
| --- | --- | --- |
| November 3, 2003 | JANGAYYA CHALLAPALLI, M.D. | carotid endarterectomy |
| November 11, 2003 | JANGAYYA CHALLAPALLI, M.D. | femoral-femoral bypass |
| November 11, 2003 | JANGAYYA CHALLAPALLI, M.D. | angioplasty femoral artery |
| November 12, 2003 | JANGAYYA CHALLAPALLI, M.D. | femoral-femoral bypass |
| November 13, 2003 | WILLIAM G. REILLY, M.D. | total knee replacement |
| November 14, 2003 | WILLIAM G. REILLY, M.D. | total hip replacement |
| November 24, 2003 | JANGAYYA CHALLAPALLI, M.D. | aorto-femoral bypass |
| December 2, 2003 | M C PAREKH, M.D. | redo carotid endarterectomy |

| December 2, 2003 | M C PAREKH, M.D. | carotid endarterectomy |
|---|---|---|
| December 3, 2003 | M C PAREKH, M.D. | carotid endarterectomy |
| December 8, 2003 | WILLIAM G. REILLY, M.D. | total knee replacement |
| December 8, 2003 | WILLIAM G. REILLY, M.D. | total hip replacement |
| December 9, 2003 | M C PAREKH, M.D. | redo carotid endarterectomy |
| December 10, 2003 | JANGAYYA CHALLAPALLI, M.D. | aortic aneurysm |
| December 11, 2003 | SUDHIR SRIVASTAVA, M.D | resection abdominal aneurysm aortic, incidental splenectomy |
| December 11, 2003 | JANGAYYA CHALLAPALLI, M.D. | laproscopic cholecystectomy |
| December 15, 2003 | WILLIAM G. REILLY, M.D. | total hip replacement |

36.     On December 8, 2003, a patient was admitted to ALLIANCE HOSPITAL, LTD. by WILLIAM G. REILLY, M.D. for a total knee replacement. The patient is/was a Medicare recipient. The anesthesia was performed by an unsupervised Certified Registered Nurse Anesthetist. Subsequent to the total knee replacement, the patient was ordered by the physician to return home. The bill for the total knee replacement submitted to Medicare was upcoded to reflect a physician anesthetist service for the purpose of receiving higher payment. Under the State of Texas, a hospital offering anesthetist services must have the service supervised by an physician anesthetist and/or operating physician. The policies of such should be set out in the bylaws of the hospital.

37.     The board of ALLIANCE HOSPITAL, LTD. chose to ignore this policy despite the warnings of the Anaesthesiologists of ALLIANCE HOSPITAL, LTD. Further, contracts were written for Nurse Anesthetists of ALLIANCE HOSPITAL, LTD. classifying them as independent practitioners of ALLIANCE HOSPITAL, LTD. However, the Nurse Anesthetists were not independent practitioners of ALLIANCE HOSPITAL, LTD.

38.     With such contract with the Nurse Anesthetists, ALLIANCE HOSPITAL, LTD. would bill Medicare and/or Medicaid for full physician anaesthesia services.

39.     The improper and fraudulent billing on the part of ALLIANCE HOSPITAL, LTD. continued from at least August 2003 through May 2004.  The improper billing also included multiple instances in which no physician was involved in patient care.  The most notably improper procedures and billing occurred by VINCENT RASCON, D.P.M. and an unsupervised Nurse Anesthetist.

## MISCELLANEOUS

40.     On or about August 11, 2003, there was performed by MICHAEL LOGAN RAMSEY, M.D. a cervical spine fusion; however, MICHAEL LOGAN RAMSEY, M.D. improperly made an incision into the vertebral artery.  Therefore, an on-table vascular consult with SUDHIR SRIVASTAVA, M.D was obtained.  SUDHIR SRIVSTAVA, M.D. attempted to ligate the vertebral artery to control the bleeding.  Subsequently, the wound was packed and the patient was transferred to the Intensive Care Unit on ventilation and hypotension protocols.

41.     On or about August 12, 2003, the patient was returned to the Operating Room where the patient had profuse bleeding from the vertebral artery which had been opened.  The wound was repacked and the patient was transferred to another hospital where the vertebral artery (unligated) was embolized to control bleeding.  Subsequently, the patient was returned to ALLIANCE HOSPITAL, LTD.

42.     On or about August 13, 2004, the wound was primarily closed.  Thereafter, the patient was sent to rehabilitation.

COMPLAINT                                                                                    Page 11

43.    After discharge of the patient, the hospital records were altered to reflect an undocumented and unscarred surgery that deflected the normal course of the vertebral artery. This was not correct.

44.    The vascular consult was altered to reflect the surgeon for the erroneous and unnecessary artery ligation as JANGAYYA CHALLAPALLI, M.D. (semi-retired) rather than SUDHIR SRIVASTAVA, M.D. (major shareholder at ALLIANCE HOSPITAL, LTD.).

45.    On information and belief, the patient was a Medicare recipient and a bill was sent to Medicare by ALLIANCE HOSPITAL, LTD. for the incident described in paragraphs 40 through 44 herein and above.  However, the patient was not billed for their share of co-pay and deductible which is against the rules and regulations of the Centers for Medicare/Medicaid Services (CMS) and Medicare.

46.    On April 22, 2004, WILLIAM G. REILLY, M.D. was scheduled to perform a right hip replacement at ALLIANCE HOSPITAL, LTD.  However, there was a delay for the surgery to be performed on April 22, 2004.  On such date, WILLIAM G. REILLY, M.D. yelled and cursed at the nursing staff for such delay.  The patient of WILLIAM G. REILLY, M.D. became very upset and apologized to WILLIAM G. REILLY, M.D. for the delay.  Subsequently, the patient was sedated and taken to the Operating Room, anesthetized and positioned for surgery.

47.    WILLIAM G. REILLY, M.D. noted an eschar (burn scar) on the operative leg, which was a surprise to WILLIAM G. REILLY, M.D.  Therefore, the surgery for the right hip replacement was canceled.

COMPLAINT                                                                                              Page 12

48.     The dictation for the case reflected a planned procedure on the right knee; however, the medical record personnel of ALLIANCE HOSPITAL, LTD. instructed WILLIAM G. REILLY, M.D. to change the record to reflect a procedure on the right hip.

49.     The incident described in paragraphs 46 through 48 herein and above is a recurring problem with instability on Friday schedules and complications on Monday cases.

50.     WILLIAM G. REILLY, M.D. is the major investor in ALLIANCE HOSPITAL, LTD. and Chief of Surgery at ALLIANCE HOSPITAL, LTD.; however, WILLIAM G. REILLY, M.D. should be removed as the Chief of Surgery at ALLIANCE HOSPITAL, LTD.

51.     On March 23, 2004, a patient of ALLIANCE HOSPITAL, LTD. had a prior coronary bypass and a pacemaker insertion in February. During surgery, the patient was given a large dose of opiates and extubated. During transport to the Intensive Care Unit, the patient suffered a respiratory arrest which was ignored by the Certified Registered Nurse Anesthetist. While in Intensive Care Unit, the patient condition was noted and the patient was re-intubated and resuscitated. However, at that point, the patient was brain-dead. The post-operative consultations reported the patient suffered from cardiac arrest despite functioning pacemaker. Further, the Certified Registered Nurse Anesthetist was working at ALLIANCE HOSPITAL, LTD. despite the termination of contract two (2) weeks prior to the incident on March 23, 2004. This was paid for by Medicare.

## STARK LAW

52.     Under the provisions of the Stark Law, relatives, including, but not limited to the spouse, of physicians invested in a hospital/health care facility cannot have any investment in the same hospital/health care facility.

COMPLAINT                                                                                   Page 13

53.     In determination of this case, it should be determined by the United States Government the different suppliers for ALLIANCE HOSPITAL, LTD.

54.     The medical procedures performed by the Defendants herein, jointly and severally, were submitted to the United States Government/Medicare by the Defendants, jointly and severally, for the purposes of receiving payment by the United States Government/Medicare.

55.     The materially false and/or fraudulent forms submitted by the Defendants for payment were signed by the Defendants either jointly and/or severally or caused to be signed by some other person certifying that the claim forms were true and alleged services rendered and medical tests performed that were not necessary.

56.     The above-mentioned forms submitted for payment by the Defendants were mailed to both, the federally-funded health care insurance programs and/or private health care insurers, via the United States Postal Service or by electronic methods.

57.     The payment checks from the federally-funded insurance programs and private health care insurers were either mailed via the United States Postal Service, by electronic methods and/or sent by direct deposit to the Defendants.

58.     Medical insurance carriers, both federally-funded and private, share certain information about chronic or serious medical conditions with a central database used by insurance underwriters.  Serious or chronic medical conditions and diagnoses regarding a patient, whether true or fraudulently created by a medical doctor to justify increased billings, may be a basis to deny that patient future medical, life and disability insurance coverage.

59.    There was a scheme on the part of the Defendants, jointly and/or severally, to submit or caused to be submitted false and/or fraudulent claims for the purpose of receiving payment for such.

60.    The criminal statutes that may be relevant in this case, include, but are not necessarily limited to, the following, to wit:

      (a)    18 U.S.C., §287 - False, Fictitious or Fraudulent Claims;

      (b)    18 U.S.C., §1001 - Statements or entries generally;

      (c)    18 U.S.C., §1341 - Fraud and Swindles;

      (d)    18 U.S.C., §1343 - Fraud by Radio, Wire or Television;

      (e)    18 U.S.C., §1961 - Racketeer Influenced and Corrupt Organizations;

      (f)    18 U.S.C., §1501, *et seq.* - Obstruction of Justice;

      (g)    18 U.S.C., §1510, *et seq.* - Criminal Investigation.

61.    Further, on information and belief, there has been a violation of the Defendants, jointly and/or severally, of 42 U.S.C. §1320(a)(7)(b).  Additionally, there has been a violation of the Anti-Kickback Statute found in 42 U.S.C. §1328(7)(a).

## CAUSES OF ACTION

62.    All causes of action herein adopt and make a part hereof for all purposes all preceding and post paragraphs set out herein.  It is the intention of the Claimant/Relator to state that each cause of action is brought jointly and in the alternative to all other causes of action. The following causes of action are brought against the Defendants herein, jointly and severally.

## I.
## FALSE CLAIMS ACT
### 31 U.S.C.A., §3729, *ET. SEQ.*, AS AMENDED

63.      The Claimants/Relators, MICHAEL HILDEBRAND, M.D. and UNITED

STATES OF AMERICA, sue the Defendants, jointly and severally, under the tort of the False

Claims Act, 31 U.S.C.A., §3729, *et. seq.*, as amended.

64.      The Claimant/Relators have met all the prerequisites of 39 U.S.C.A., §3729, *et.*

*seq.*, as amended.

65.      The proximate cause and damages set forth herein were brought about by the

actions of the Defendants jointly, severally and/or individually.

## II.
## CONSPIRACY

66.      The Claimants/Relators, MICHAEL HILDEBRAND, M.D. and UNITED

STATES OF AMERICA, sue the Defendants, jointly and severally, for the tort of conspiracy.

67.      There were two (2) or more persons acting together to defraud/falsely claim the

UNITED STATES OF AMERICA and its agencies and/or subcontractors.  The Defendants acted

to accomplish an object, which was the payment of funds.  There was a meeting of the minds on

the object or course of action by the Defendants.  The unlawful acts complained hereof came as a

result of the meeting of the minds of the Defendants.

68.      The proximate cause and damages set forth herein were brought about by the

actions of the Defendants jointly, severally and/or individually.

## III.
## FIDUCIARY DUTY

69.     The Claimants/Relators MICHAEL HILDEBRAND, M.D. and UNITED STATES OF AMERICA, sue the Defendants, jointly and severally, for a breach of a fiduciary duty.

70.     The Defendants had a fiduciary relationship with the UNITED STATES OF AMERICA.  The Defendants breached their fiduciary duty to the UNITED STATES OF AMERICA by their actions in applying for funds that could have been used by other parties for treatment.  The Defendants' breach resulted in injury to the UNITED STATES OF AMERICA.

71.     The proximate cause and damages set forth herein were brought about by the actions of the Defendants jointly, severally and/or individually.

## IV.
## FRAUD

72.     The Claimants/Relators, MICHAEL HILDEBRAND, M.D. and UNITED STATES OF AMERICA sue the Defendants, jointly and severally, for fraud.

73.     The Defendants, acting jointly and severally, made a representation to the UNITED STATES OF AMERICA.   This representations made by the Defendants were material.  The representations made by the Defendants were false.  The Defendants either knew that the representations were false or made the representation recklessly as a positive assertion and without the knowledge of its truth.  The Defendants made the representation with the intent that the Claimants act upon it. The Claimants  relied upon the representation of the Defendants.

74.     The proximate cause and damages set forth herein were brought about by the actions of the Defendants jointly, severally and/or individually.

## V.
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

75.     Claimants/Relators, MICHAEL HILDEBRAND, M.D. and UNITED STATES
OF AMERICA sue the Defendants, jointly and severally, for the intentional infliction of
emotional distress.

76.     The Defendants, acting jointly and severally, acted intentionally and/or recklessly.
The Defendants' conduct, jointly and severally, was extreme and outrageous.  The Defendants'
conduct were directed toward the Claimant/Relator, UNITED STATES OF AMERICA.  The
Defendants' conduct, jointly and severally, caused the Claimants emotional distress because such
was severe and outrageous.

77.     The proximate cause and damages set forth herein were brought about by the
actions of the Defendants jointly or severally.

## VI.
## INVASION OF PRIVACY

78.     The Claimants/Relators, MICHAEL HILDEBRAND, M.D. and UNITED
STATES OF AMERICA sue the Defendants, jointly and severally, for the invasion of privacy.

79.     The Defendants, acting jointly and severally, intentionally intruded on the
Claimants' solitude, seclusion or private affairs.  The intrusion by the Defendants would be
highly offensive to a reasonable person.  The Claimants suffered an injury as a result of the
Defendants' intrusion.

80.     The proximate cause and damages set forth herein were brought about by the
actions of the Defendants jointly or severally.

COMPLAINT                                                                      Page 18

## VII.
## NEGLIGENCE

81.     The Claimants/Relators, MICHAEL HILDEBRAND, M.D. and UNITED

STATES OF AMERICA sue the Defendants, jointly and severally, for the tort of negligence.

82.     The Defendants, acting jointly and severally, owed a legal duty to the Claimants.

The Defendants breached the duty.

83.     The proximate cause and damages set forth herein were brought about by the

actions of the Defendants jointly or severally.

## DAMAGES

84.     The actions of the Defendants, jointly and severally, were the proximate cause of

the damages set forth herein and in all of the causes of action.

85.     The damages sought are brought  on the following basis, to wit:

    (a)     He be awarded all damages as provided by the False Claims Act, 31
            U.S.C.A., §3729, *et. seq.*, as amended;

    (b)     Mental anguish (past, present and future);

    (c)     Intentional infliction of emotional distress;

    (d)     Loss of earning capacity (past, present and future);

    (e)     Pre-judgment/post-judgment interest;

    (f)     Statutory and/or common law damages;

    (g)     Punitive and/or exemplary damages.

    (h)     Costs of Court;

    (i)     Reasonable attorney's fees; and

    (j)     Potential future costs of medical to treat physical and/or mental effects.

86.   Under the Human Resources Code, there is a provision, 36.110(c), which allows a person to receive monies.  A private person is required to serve a copy of the petition upon the Attorney General and wait for the State to proceed with an action prior to the person can recover attorneys' fees from the proceeds of the action.  Because of the False Claims Act, and the requirement that there can not be any action for at least sixty (60) days, the Claimant has not filed, nor has he contacted, the Attorney General of the State of Texas so that an action may proceed.  However, once the Seal is broken, this act will be done.

87.   Claimant seeks attorneys' fees in this cause for the usual, reasonable and customary amounts in the vicinity in which the services were rendered.  It is assumed that the usual, reasonable and customary amounts would be between one hundred seventy five dollars ($175.00) to two hundred dollars ($200.00) per hour for an attorney of the undersigned's experience.

88.   Claimant/Relator, MICHAEL HILDEBRAND, M.D.,  reserves the right to amend and/or supplement this Complaint in the future.

89.   WHEREFORE, PREMISES CONSIDERED, the following requests are made:

(a)   The United States Government decide, as quickly as possible, whether it will join in this Complaint;

(b)   That amounts of money, in excess of the minimum jurisdictional limits of this Court, be awarded to the UNITED STATES OF AMERICA and to the Claimant/Relator, MICHAEL HILDEBRAND, M.D.;

(c)   Such other and further relief to which the UNITED STATES OF AMERICA and Claimant/Relator, MICHAEL HILDEBRAND, M.D., are justly entitled;

(d)   Such other and further relief to which Claimant is entitled, both at law and in equity;

(e)   Claimant/Relator, MICHAEL HILDEBRAND, M.D., demands a Jury
Trial.

90.   REQUEST:   It is respectfully requested as stated above.

Respectfully submitted,

*Gerald K. Fugit*
Gerald K. Fugit

GERALD K. FUGIT, P. C.
Attorney at Law
412 North Texas
Odessa, Texas 79761
Tel: (432) 332-1661
Fax: (432) 335-0003
State Bar No. 07501000

ATTORNEY FOR CLAIMANT/RELATOR
MICHAEL HILDEBRAND, M.D.

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into this ▮▮▮▮ day of ▮▮▮▮▮▮▮▮▮, ▮▮▮▮, by and between **Alliance Hospital, Ltd.**, a Texas Corporation(the "Employer") and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Employee") to be effective on the Employment Commencement Date (defined below).

## RECITALS

A.    The Employer, Alliance Hospital, Ltd. ("Alliance") is a Texas corporation, doing business as Alliance Hospital ("Hospital").

B.    The Employee, a certified registered nurse anesthetist, licensed to practice or making application for a license to practice nurse anesthesia in the State of Texas, desires employment as an employee of the Employer under the terms and conditions of this Agreement. The Employee's area of specialty is nurse anesthesia. Employee will perform these services as an independent practitioner.

C.    The Employer desires to employ the Employee under the terms and conditions of this Agreement for the purpose of providing Anesthesia services at Alliance Hospital, Ltd. ("Alliance")

The terms of this Agreement are as follows:

1.    **Employment**. The Employer hereby employs the Employee, and the Employee hereby accepts employment, upon the terms and conditions set forth herein. While this Agreement may be executed on a different date, the date on which the employment of the Employee shall commence is the latter of (1), ▮▮▮▮▮▮▮▮▮▮ or (2) the date the Employee is licensed to practice nurse anesthesia in the State of Texas and begins active practice of nurse anesthesia in **Odessa**, Texas at the office of the Employer (the "Employment Commencement Date").

2.    **Duties and Services to be provided by the Employee.**  The Employee will be a full-time employee of the Employer.  As such, he agrees to devote all his business time and attention to the performance of his duties hereunder for and on behalf of the Employer during the term of this Agreement. Employee also agrees not to practice, either directly or indirectly, alone or in association with others, the profession of nurse anesthesia other than as an employee of the Employer.  The Employee agrees not to engage in any other profession, business or other endeavor that would necessitate the Employee giving any portion of the Employee's time that otherwise should be devoted to the Employer's business.  The Employee agrees to serve the Employer faithfully and diligently, according to the best of his abilities and will use every effort to promote the best interests of the Employer.

The foregoing will not, however, preclude the Employee from passively investing in entities that do not require his personal services and that do not engage in business activities in direct competition with or adverse to the business activities then engaged in by the Employer.  The foregoing will also not preclude Employee from performing locum tenens services during such time as Employee is on vacation, provided Employee maintains professional liability insurance to cover these services.

1


PLAINTIFF'S EXHIBIT
A

3.   **Supervision and Inquiries**.  Employee shall comply with applicable laws relating to the supervision of other allied health professionals. Employee shall notify Employer of any inquiry regarding Employee by the Texas State Board of Nursing, Texas Department of Health or similar entity within twenty-four (24) hours of his receipt of the same.

4.   **Disclaimer Regarding Admissions.**  Under no circumstances is Employee obligated to refer patients to Alliance, Alliance outpatient services or any health care facility operated by Alliance wherever located.

5.   **Entitlement to Revenues from the Employee's Services**.  All nurse anesthesia services and other personal services performed by the Employee for any remuneration (with the exception of locum tenens services mentioned in Section 2) are services performed as an employee of the Employer and the Employer shall be wholly entitled to collect and receive all such revenues. To this end, all income generated by the Employee for professional service activities, including, but not limited to, lectures, writing of treatises and articles, proceeds from medical products or appliances developed, witness fees, and consultation work for any governmental or other agency shall belong to the Employer, whether paid directly to the Employer or to the Employee. The Employee agrees, upon request by the Employer, to render an accounting of all transactions relating to his practice as a physician during the term of this Agreement.

6.   **Direction of Services**.  The Board of Directors of the Employer is responsible to direct, control, and supervise the duties and work of the Employee; provided, however, that it will not impose employment duties or constraints of any kind that would require the Employee to infringe the ethics of the nursing profession or violate any law or differ materially from those placed on any other physician employee of the Employer.

7.   **Particular Duties**.  The Employee possesses specialized training and experience in nurse anesthesia, therefore, the Employee agrees to perform such professional and other duties for the Employer as may be requested of the Employee by the Board of Directors. Such duties may include, but are not limited to, rendering  services to patients on behalf of the Employer, keeping and maintaining (or causing to be maintained) appropriate records regarding all professional services rendered by Employee, preparing and attending to all reports, claims and correspondence necessary or required by the Employer or any third party and being "on call" or "on duty" for Alliance at night, on weekends and on holidays, rotated among the Employer's other employees in a reasonable manner, but provided that Employee shall not be required to be "on call" or "on duty" in excess of any other employee.

8.   **Professional Conduct**.  The Employee, subject to the direction and control of the Employer, shall carry on the practice of nurse anesthesia in accordance with the standards of professional conduct promulgated by applicable credentialing Boards and in compliance with applicable federal and Texas law governing the practice of medicine.

2

9.  **Compliance with Rules.**  The Employee shall observe and comply with the reasonable rules and regulations of the Employer and shall carry out and perform orders, directions, and policies of the Employer as they may be from time to time stated to the Employee.

10.  **Fees for Services**.  The Employer shall establish the fees and charges for the Employee's services.  All bills for services performed by the Employee shall be prepared, transmitted and collected by the Employer.  All revenue generated by the services of the Employee shall be the sole property of the Employer.

11.  **Compensation**.  Employee shall receive, for services to be rendered under this Agreement, an annualized base salary ("Base Salary") equal to $_____.  Such Base Salary shall commence as of the Employment Commencement Date, and shall be payable in installments consistent with the Employer's payroll policies.

Benefits:  Employer will provide healthcare and dental insurance at no cost for Employee and will make available same for Employee's family at prevailing rates.  In addition, the Employee will be eligible to participate in the approved 401K program.

Incentive Pay Plan:  Employee is also eligible for incentive pay plan.  (Up to 50% of base pay).

12.  **Professional Dues**.  The Employer agrees to pay the Employee's dues in local, state, and national societies and associations consistent with its practice for other employees of the Employer.

13.  **Professional Development**.  The Employer will also pay the reasonable expenses of the Employee up to $ 2,000.00 incurred in connection with attendance at professional institutes, conventions, seminars and similar functions, in accordance with the policy established by the Board of Directors.

14.  **Professional Liability Insurance and General Liability Insurance.**  The Employer, at its expense, agrees to obtain and maintain a claims-made professional liability insurance for the Employee in an amount of $250,000.00/$750,000.00.  The Employer's obligation to provide the Employee with professional liability coverage will cease upon the Employee's termination of employment.  In addition, the Employer, at its expense, will obtain and maintain such other forms of insurance as may be advisable for its business, such as property and general liability insurance, in an amount and with coverage determined by the Employer.

15.  **Expenses.**  During the period of his employment, the Employee will be reimbursed for his reasonable business expenses in accordance with the general policy of the Employer as adopted by the Employer from time to time

16.  **Working Facilities.**  The Employer will furnish the Employee with such facilities, equipment, supplies, and services as Employer deems are required by his position and for the adequate performance of his professional duties hereunder.

17.  **Vacations and Meetings: Holidays**.  The Employee will be entitled to vacation with pay of five (5) weeks in each year during the term of this agreement.  The Employee may attend appropriate

3

professional society and educational meetings and conventions up to as maximum period out of the office of one (1) week per year, and as in accordance with the Employer's policy. The Employee will be entitled to such additional holidays with or without pay as the Board of Directors may approve.

18.   **Case Records and Histories**.  All records, case histories, X-ray films, and personal and regular files concerning patients of the Employer or patients consulted, interviewed or treated and cared for by the Employee shall belong to and remain the property of the Employer.

19.   **Term: Termination**.  The employment relationship established by this Agreement will commence on the Employment Commencement Date and shall continue until terminated, termination to take place upon the first to occur of any of the following events (the "Termination Date"):

(a) Two (2) years from the effective date;

(b) The suspension, revocation or cancellation of the Employee's license to practice nurse anesthesia in the state of Texas;

(c) The failure or refusal of the Employee, after the receipt of thirty (30) days written notice from the Employer, (1) to faithfully and diligently perform the usual and customary duties of his employment, or (2) to comply with the policy standards and regulations of the Employer or (3) to adhere to the provisions of the Agreement;

(d) Upon written notice to the Employee, at the option of the Employer, if the Employee is unable to attain active privileges at Alliance Hospital, Ltd. or is dismissed or suspended from the staff of Alliance Hospital, Ltd.

(e) The finding by any board, institution, organization or professional society having a right or privilege to pass upon the professional conduct of the Employee and to discipline the Employee therefor, that the Employee is or has been guilty of unprofessional or unethical conduct; or a determination by the Board that the Employee has conducted or is conducting himself in an unprofessional, unethical or immoral manner such as to discredit the Employer, its reputation, character and standing and/or that of the members and other employees of the Employer;

(f) The Employer and the Employee agree in writing to termination.

(g) Death of the Employee;

(h) Upon one hundred and twenty (120) days notice from Employer to Employee.

20.   **Non Disclosure**.  The Employee understands and acknowledges he will receive special training, and access to trade secrets, patient lists, patient files and corporate financial information which are exclusively the property of the Employer.  Other than in the ordinary course of business, the Employee shall not disclose such information to any one other than the Employer. The Employer further covenants and agrees that upon termination of his employment, he will not under any circumstances disclose information regarding trade secrets, patient lists, patient files and corporate

4

financial, administrative or managerial information if such information was obtained by him through his employment with the Employer.

21. **Patient Charts.** In the event the Employee fails to maintain his patient records and charts, at Alliance, as current to within 30 days of the date of service rendered, all compensation due hereunder shall be held by the Employer, and shall not be paid to the Employee until he has brought all such patient records and charts current.

22. **Federal Record Keeping Requirements.** Notwithstanding anything to the contrary in this Employment Contract, if it shall be determined or asserted that this Employment Contract is a contract between a provider and a subcontractor within the meaning of 42 USC §1395x(v)(1) (I) of the Social Security Act, as amended, or any rules, regulations, or judicial or administrative interpretations or discussions promulgated or made pursuant thereto, then Employee agrees that until the expiration of four years after the furnishing of any services pursuant to this Employment Contract, Employee shall make available, upon written request by the Secretary, or upon written request by the Comptroller General, or any of their duly authorized representatives, the contract, and books, documents and records of the Employee that are necessary to certify the nature and extent of such costs.

23. **Notice**. All notices provided for by this Agreement shall be made in writing; (a) either by actual delivery of the date of its actual receipt by the party entitled thereto or (b) if by mail, on the second day following the date of deposit in the United States mail.

24. **Succession**. This Agreement shall inure to the benefit of and be binding upon the parties hereto and upon their successors in interest of any kind whatsoever.

25. **Non-assignability**. Neither this Agreement, nor any rights or obligations of either party hereunder may be transferred to an assignee, except that the Employer may assign this entire Agreement to any successor to all or substantially all of the Employer's business and assets.

26. **Entire Agreement**. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter contained herein and supersedes all prior agreements and understandings, oral or written, if any between the parties hereto. No modification or amendment of any of the terms, conditions, or provisions herein may be made otherwise than by written agreement signed by the parties hereto.

27. **Governing Law**. The laws of the State of Texas shall govern the validity, construction, enforcement and interpretation of this Agreement.

28. **Parties Bound**. This Agreement and the rights and obligations hereunder shall be binding upon and insure to the benefit of the Employer, the Employee, and their respective heirs, personal representative, successors, and assigns; provided, however, that neither party may assign any rights or obligations hereunder. This Agreement shall also bind and inure to the benefit of any successor of the Employer by merger or consolidation, or any assignee of all of the Employer's properties.

29. **Titles. Headings**. The titles, heading, and captions used in this Agreement have been inserted

• for convenience only and any conflict between the headings and text shall be resolved in favor of the text.

30.   **Counterpart**.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and together shall constitute one and the same Agreement.

**EMPLOYER:**

**ALLIANCE HOSPITAL**

By:_____

        Chief Executive Officer